***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Stephenson. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Stephenson with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between plaintiff and defendant-employer on October 16, 2002.
3. The date of alleged injury was October 16, 2002.
4. AIG Claim Services was the compensation carrier on the risk.
5. Plaintiff's average weekly wage is $416.63.
6. The parties further agreed to stipulate to the following:
a. A complete copy of plaintiff's medical records.
b. A copy of plaintiff's recorded statement.
c. Industrial Commission forms 18, 19, 33, 33R, 61, and 22.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was employed by defendant-employer as a commissioned sales associate in the shoe department. Plaintiff's job duties included climbing ladders in the stockroom and reaching overhead for boxes of shoes. Prior to October 16, 2002, plaintiff was in excellent health and had never had any problems with her neck, left shoulder, left arm, left leg or low back.
2. A week or two prior to October 16, 2002, plaintiff and the other sales associates in the shoe department were asked by their supervisor to sign a contract which required each of them to clean up a certain section of the shoe stockroom. Plaintiff and another employee worked together on one section of the stockroom on October 15, 2002, with plaintiff handing boxes of shoes up to the other employee on the ladder. Plaintiff felt fine when she left work that day.
3. The next day, October 16, 2002, plaintiff reported to work before the store opened, and continued working alone to organize her section of the stockroom. This required plaintiff to climb up and down a library ladder while holding four or five boxes of shoes. When plaintiff's co-workers in the shoe department arrived, they took turns covering the sales floor while plaintiff worked organizing the stockroom. One of the co-workers, Renee Flewwellin, testified that she heard a commotion in the back which she knew from experience to be the sound of boxes of shoes falling. Soon thereafter, plaintiff came out of the stockroom rubbing her shoulder. She told Ms. Flewwellin that she had fallen on the ladder. Plaintiff took Ms. Flewwellin and another co-worker, Richard Glasgow, to the back room to demonstrate how she had slipped on the ladder and grabbed on with her left arm to keep from falling to the floor.
4. Plaintiff continued to work the rest of that day, but was not able to report the injury because no supervisor was available. When plaintiff returned to work the next day, she told her supervisor Joyce that she had fallen on the ladder the day before. Plaintiff also tried to report the injury to her supervisor Carlos, but he told her he did not want to hear about it.
5. On October 19, 2002, plaintiff told her supervisor Joyce that she needed to see a doctor. Joyce told her to go report her injury to Robert in loss prevention. Robert completed a Form 19 on October 19, 2002, and told plaintiff that if she needed to seek medical treatment, just have the provider call J.C. Penney for authorization.
6. On October 20, 2002, plaintiff presented to the Emergency Room at Rex Hospital with a four-day history of pain in her neck, left shoulder, and left lower back. The ER doctor diagnosed acute musculoskeletal strain neck and back and advised plaintiff to follow up with her family doctor or a workers' compensation doctor if her symptoms persisted, so that further evaluation and treatment could be performed including MRI of the neck and back. The ER doctor also gave plaintiff a work note for no heavy lifting for seven days. Plaintiff returned to work, gave her note to Jane Harrison in personnel, and continued to work running the cash register and putting on price tags.
7. Plaintiff's pain persisted, so she went to her family doctor, Dr. Flanagan. Dr. Flanagan's October 29, 2002 office note indicates that plaintiff gave Dr. Flanagan a history of injury occurring when she slipped while standing on a ladder, grabbing with her left arm to keep from falling. Dr. Flanagan prescribed physical therapy and medication, and advised plaintiff to remain out of work until November 4, 2002.
8. After plaintiff took Dr. Flanagan's note to work, she received a call from the workers' compensation adjuster, who took a recorded statement and told plaintiff she had to see an authorized doctor at Concentra. Even though plaintiff had just seen Dr. Flanagan, she went to Concentra later that same day.
9. Plaintiff was seen by a P.A. during her first visit at Concentra on October 29, 2002. According to the P.A.'s supervising physician, Dr. Landolf, the P.A.'s note contains a typographical error, to the extent that it refers to a right-sided injury as opposed to left-sided injury. Aside from the typographical error, plaintiff gave the P.A. at Concentra the same history of injury she had given Dr. Flanagan, i.e., the immediate onset of pain after slipping on a ladder at work and grabbing with her arm to keep from falling. The P.A. diagnosed cervical strain and cervical radiculopathy, and advised plaintiff to return to work with a 10-pound lifting restriction and no reaching above shoulder level.
10. Plaintiff returned to work and continued to follow-up at Concentra for her ongoing complaints of left neck, left arm and left shoulder discomfort. On October 31, 2002, plaintiff was seen by Dr. Landolf, an internist at Concentra, to whom she again gave a history of slipping on a ladder and grabbing it with her left arm. Dr. Landolf diagnosed "probable cervical strain, mild," and commented that plaintiff's left arm paresthesias did not fit any specific dermatomal distribution. Dr. Landolf continued plaintiff on work restrictions, prescribed physical therapy, and opined that further testing including EMG and MRI might be helpful in delineating the cause of plaintiff's ongoing complaints.
11. Plaintiff returned to Dr. Landolf for follow-up on November 5, 2002. At that visit, plaintiff told Dr. Landolf that she lifts shoe boxes and goes up and down ladders, but that "the extreme discomfort came when she slipped while being on the ladder." Following examination which again revealed left arm paresthesias that did not fit any specific dermatomal distribution (meaning that it did not correspond to one specific nerve root), Dr. Landolf indicated that he wanted to refer plaintiff to a neurosurgeon or orthopaedist who specializes in cervical pathologies.
12. Plaintiff returned to Dr. Landolf on November 11, 2002, reporting that she was no better and that she was continuing to work within her restrictions. Dr. Landolf again recommended physical therapy, MRI, and referral to a neurosurgeon or orthopaedist. However, the adjuster would not authorize this treatment, so plaintiff returned to Dr. Flanagan, seeking treatment using her private insurance. Dr. Flanagan ordered MRI's for the shoulder and neck, the results of which revealed significant abnormalities at each site, prompting Dr. Flanagan to refer plaintiff to Dr. Margraf, a neurosurgeon who was covered by plaintiff's group insurance.
13. On December 23, 2002, plaintiff came under the care of Dr. Margraf at Raleigh Neurosurgical Clinic. Plaintiff gave Dr. Margraf a history of sudden onset of left neck, shoulder, arm, and leg pain in October 2002 "after an incident where she caught herself from a fall off of a ladder with her left arm." Dr. Margraf reviewed the MRI of the cervical spine, which he interpreted as showing cervical spondylosis with central stenosis at C5-6, C6-7, with central and left posterolateral disc herniation at C5-6, with moderate to severe cord flattening at C5-6 and C6-7. With the benefit of the diagnostic studies that Dr. Landolf did not have, Dr. Margraf diagnosed cervical myelopathy, which Dr. Margraf testified is the compression or bruising of the spinal cord from a traumatic injury. Dr. Margraf recommended a two-level cervical fusion, which was scheduled for January 22, 2003.
14. Plaintiff continued to work in a light-duty capacity for defendant-employer until she went out for surgery on January 16, 2003. Plaintiff testified that from the date of the injury until January 16, 2003, she was not able to earn the same wages she was earning at the time of the injury because she was not earning the commissions she was usually paid as a commissioned sales associate.
15. Following the surgery on her neck, plaintiff continued to experience persistent weakness and numbness in her left leg, left grip and left triceps, and continued clumsiness in her hand with mild to moderate cervical muscle spasm. Dr. Margraf testified that it was not unusual for symptoms of myelopathy to persist despite surgery. By April 14, 2003, Dr. Margraf felt that plaintiff's cervical myelopathy, while not resolved, was at least stable. Dr. Margraf assigned a 15% permanent impairment rating to plaintiff's back, and opined that it would be difficult for plaintiff to return to the kind of work she did pre-operatively.
16. On May 7, 2003, plaintiff underwent an FCE, the results of which showed restrictions in plaintiff's ability to lift, reach overhead, stand, walk and climb ladders. Plaintiff took her work restrictions to defendant-employer's general manager, and was told that there was no work available for her within her restrictions. Plaintiff asked defendant-employer to keep her in mind if a light duty position became available.
17. Plaintiff then initiated her own job search. She applied with three private employment agencies, and also sought assistance from the State's Department of Vocational Rehabilitation. She utilized the resources at the Employment Security Commission, and had applied for 43 jobs as of the date of the hearing before the deputy commissioner. She even had one interview, and did very well on the test, but was ruled out when she could not get down the stairs without assistance.
18. After she was released by Dr. Margraf, plaintiff returned to Dr. Flanagan for pain management treatment. Based upon her continuing complaints of left shoulder pain and the pathology demonstrated on the shoulder MRI that was done prior to the neck surgery, Dr. Flanagan referred plaintiff to Dr. Speer, an orthopaedic surgeon who specializes in sports medicine and shoulder surgery.
19. Plaintiff came under the care of Dr. Speer on October 7, 2003. Plaintiff gave Dr. Speer a history of on-the-job injury in October 2002 when "she was on a ladder and she fell and hurt her shoulder because she hung from the ladder." Dr. Speer described this as a "hyper-elevation distraction-type injury." Dr. Speer read the December 2002 MRI of the shoulder as showing AC joint arthropathy and a partial tear of the supraspinatus tendon. Dr. Speer thought that in all likelihood plaintiff also had a rotator cuff injury, but in order to make a recommendation regarding treatment, he felt a new MRI was in order. When plaintiff returned to Dr. Speer on October 22, 2003, he explained that the MRI showed clear AC arthropathy and biceps subluxation with rotator cuff tear probably greater than 50%. Based upon these findings and the failed conservative treatment to date, Dr. Speer recommended shoulder arthroscopy with subacromial decompression, distal clavicle excision, rotator cuff repair and biceps tenodesis. Dr. Speer testified that his findings during the course of the surgery were consistent with the mechanism of injury plaintiff described. As of the date of Dr. Speer's deposition, plaintiff had not reached maximum medical improvement with regard to her shoulder and had not been released from Dr. Speer's care.
20. Plaintiff's testimony regarding the mechanism of injury is accepted as credible. It is consistent with the history she gave Dr. Flanagan, Concentra, Dr. Margraf and Dr. Speer, and consistent with what she told the adjuster during her recorded statement.
21. On October 16, 2002, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer when she slipped on a ladder while re-shelving boxes of shoes, and slung around to grab the ladder with her left arm to keep from falling, for a moment holding her entire body weight with her left arm.
22. Plaintiff timely reported her injury to defendant-employer.
23. The undersigned have considered the testimony of Dr. Landolf, but finds the testimony of Drs. Margraf, Speer and Flanagan more persuasive. Drs. Margraf and Speer had the benefit of the MRI results, which revealed moderate to severe spinal cord compression and a torn rotator cuff, which Dr. Landolf was not able to diagnose with simple x-rays. Drs. Margraf and Speer also had the benefit of performing surgery during which they could see first hand the nature of the pathology in the shoulder and neck. Dr. Margraf and Dr. Speer were of the opinion that plaintiff's injuries were consistent with a traumatic event such as the incident on the ladder, and that they were not consistent with a repetitive motion injury or normal, everyday movements.
24. As a result of the October 16, 2002 injury, plaintiff sustained injuries to her neck and left shoulder which have rendered her unable to earn the same wages she was earning at the time of the injury in the same or any other employment, from January 17, 2003 to the present time.
25. All of the medical treatment plaintiff has received since the October 16, 2002 injury has been reasonable and necessary to effect a cure, give relief, or lessen the period injury has been reasonable and necessary to effect a cure, give relief, or lessen the period of disability caused by the injury she sustained at work on October 16, 2002.
26. For the period from October 16, 2002 to January 17, 2003, plaintiff suffered the partial incapacity to earn the same wages she was earning at the time of the injury, because she was not able to earn commissions while she was performing light duty work.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On October 16, 2002, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer when she slipped on a ladder while re-shelving boxes of shoes, and felt excruciating left-sided pain when she grabbed onto the ladder with her left arm to keep from falling to the floor. N.C. Gen. Stat. § 97-2(6).
2. As a result of the injury of October 16, 2002, plaintiff was temporarily and partially disabled for the period from October 16, 2002 to January 17, 2003, entitling her to benefits pursuant to N.C. Gen. Stat. § 97-30 at a rate to be determined upon defendants' production of earnings records for the period in question.
3. As a result of the injury of October 16, 2002, plaintiff has been totally disabled since January 17, 2003, entitling her to benefits pursuant to N.C. Gen. Stat. § 97-29 until further order of the Industrial Commission. Plaintiff carried her burden of proving total disability even after she was released to light duty work by virtue of her failed job search efforts. Russell v. Lowes, 108 N.C. App. 762, 425 S.E.2d 454
(1993).
4. The medical treatment plaintiff received after October 16, 2002 has been reasonable and necessary to effect a cure, give relief and lessen the period of disability. N.C. Gen. Stat. § 97-25.
5. Plaintiff's claim is not barred by the provisions of N.C. Gen. Stat. § 97-22, because defendants had actual notice of the injury within 30 days of its occurrence. Sanderson v. Northeast Constr. Co.,77 N.C. App. 117, 334 S.E.2d 392 (1985).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary partial disability benefits for the period from October 16, 2002 to January 17, 2003, at a rate to be determined upon production of her earnings records for that period of time. This compensation has accrued and shall be paid to plaintiff in a lump sum, subject to the attorney fee hereinafter approved.
2. Defendants shall pay plaintiff temporary total disability benefits at the rate of $277.77 per week, commencing January 17, 2003 and continuing until further order of the Industrial Commission. That compensation which has accrued shall be paid to plaintiff in a lump sum, subject to the attorney fee hereinafter approved.
3. Defendants shall pay all medical expenses incurred by plaintiff for treatment of the involved injury, when bills for the same have been submitted to and approved by the Industrial Commission.
4. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded herein is approved for counsel for plaintiff. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
5. Defendants shall pay the costs.
This the ___ day of December, 2004.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER